IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARTHA STRINGER and PAUL STRINGER, Attorneys in Fact for Kimberly Stringer.**,<br>*Plaintiff,*<br><br>v.<br><br>**ANDREW KOVACH, COUNTY OF BUCKS, et al.,**<br>*Defendants.* | **CIVIL ACTION**<br>**NO. 22-1525** |

**Baylson, J.**                                                                                                                    **October 6, 2025**

<u>**MEMORANDUM RE: MOTION FOR A PROTECTIVE ORDER**</u>

Defendants County of Bucks, Cueto, Forman, Kovach, Styers, Torres, Wylie, Danyell Himes, Robert Devlin, Christine Pagan, William Miles, Andrew Lynn, C.O. Canterman, Julian Duprey, Craig Geibert, Selena Heilman, Lt. Brett Morris, Lt. Niall Mander, C.O. Murdoch, Thomaleya Sherrod, Kevin South, Anthony Cruz, Jacquelyn Gill, C.O. Mimes, Chelsea MacIntyre, Sgt. Langston Mason, Crystal Biemuller, C.O. Hughes, C.O. G. Williams, and Zachary Nester (collectively "Defendants") bring a Motion for a Protective Order ("Mot.," ECF 78) pursuant to Fed. R. Civ. P. 26(c) to designate certain video recordings as confidential.  Plaintiffs Martha Stringer and Paul Stringer ("Plaintiffs"), parents and Attorneys in Fact of Kimberly Stringer, filed an Opposition to the Motion ("Opp'n," ECF 79).  Defendants filed a Response in Support of the Motion ("Reply," ECF 83).  For the following reasons, the Motion is **<u>GRANTED</u>** in part, and **<u>DENIED</u>** in part.

I. **BACKGROUND**

Plaintiffs bring this action on behalf of their daughter, Kimberly Stringer.  Compl. ¶ 2, ECF 1.  According to the Complaint, Ms. Stringer is a mentally ill woman who was housed at Bucks County Correctional Facility ("BCCF") from April 14, 2020, until June 17, 2020.  <u>Id.</u> ¶ 1.

Plaintiffs allege Defendants used excessive force against Ms. Stringer while she was housed at BCCF by repeatedly pepper spraying her for not complying with instructions despite her inability to comply due to mental illness. Id. Plaintiffs have asserted claims under 42 U.S.C. § 1983 for excessive force in violation of the Eighth and Fourteenth Amendments against the correctional officer defendants (Count I) and their participating supervisors (Count II), as well as a section 1983 municipal liability claim against Bucks County based on an unconstitutional custom or policy and failure to train (Count III). See Compl. ¶¶ 56–84.

During Discovery, Defendants produced seven BCCF video recordings depicting "use of force" incidents involving Ms. Stringer. Mot. at 1, ECF 78. BCCF defines use of force events as instances where staff members "employ physical force to address the actions and behaviors of its inmates to maintain security, prevent harm, including an inmate's self-inflicted harm, and protect themselves and others." Declaration of David Kratz[1] ("Kratz Decl.") ¶ 8, ECF 78-1. BCCF uses an electronic surveillance system to record uses of force. Id. ¶ 9. The surveillance system records use of force events with stationary mounted cameras as well as hand-held cameras called "Go Pros," which are operated by corrections officers. Id. Specifically, Defendants have produced seven videos: (1) Video 4; (2) Video 11; (3) Video 39; (4) Video 63; (5) Video 252; (6) Video 253; and (7) Video 240 (collectively, "Subject Videos") involving Ms. Stringer.[2] Id. at 2. The videos depict heightened BCCF security measures implemented to combat the COVID-19 pandemic. The videos are summarized as follows:

---

[1] David Kratz has worked at Bucks County Department of Correction for twenty-two years and currently serves as the Director of Corrections for Bucks County. Kratz Decl. ¶ 1. Director Kratz oversees the custody and supervision of inmates and the implementation and enforcement of standard policies and procedures for security and safety of inmates, staff, correctional officers, and the facility. Id. ¶ 2.

[2] Defendants have provided these seven Subject Videos to the Court for *in camera* review. In their Motion, Defendants list nine videos. Mot. at 2–3. However, Plaintiffs note that videos 63 and 238 are duplicates of each other and videos 4 and 183 are duplicates of each other. See Opp'n at 3 n.1.

- (1) Video 4: This video is two minutes and 29 seconds long. It is taken from a hand-held GoPro camera. It begins with an officer out of frame stating the date as May 20, 2020. It depicts multiple BCCF officers in riot gear surrounding Ms. Stringer who is bound to a restraining chair. One officer pushing the chair is wearing a helmet with a clear face shield, but no face mask. Other officers are wearing the same head gear and a surgical mask covering the lower face. Another officer is in a plain uniform with a surgical mask and a baseball cap. The officers remove Ms. Stringer from the chair and put her into a cell. No other inmates appear.

- (2) Video 11: This video is 19 seconds long and depicts multiple officers in a secured hallway from the vantage point of a hand-held GoPro camera. The officers identify themselves by name. Plaintiffs do not object to the Motion as to Video 11. Opp'n at 6 n.3.

- (3) Video 39: This video is 26 seconds long. The video is shot from a hand-held GoPro camera in Ms. Stringer's cell. It depicts three uniformed officers wearing surgical masks that cover the lower-half of the face and two medical staff members also wearing surgical masks. At the end, Ms. Stringer can be seen facing away from the camera in a restraining chair. No other inmates appear.

- (4) Video 63: This video is two minutes and 53 seconds long. It is shot from a hand-held GoPro camera in the common area of the cell block. Ms. Stringer is bound in a restraining chair surrounded by four officers in riot gear, wearing gas masks and helmets, as well as one officer wearing a uniform, a baseball cap, and a black surgical mask covering his lower face. In the background are two medical staff members wearing surgical masks, stethoscopes, and scrubs. At the end of the video, officers wheel Ms. Stringer into a cell. No other inmates appear.

- (5) Video 252: This video is 17 minutes and 41 seconds long. It is shot with a hand-held GoPro camera. The video begins in the common area. The officer holding the camera is coughing and another officer appears to be coughing and drinking water by a trash can. The other officer's mask is off while she drinks water. Ms. Stringer is in her cell. The officer can be heard directing other officers to report to certain locations in the BCCF. At one point, Ms. Stringer bangs her body against the cell door and the wall. Around the nine-minute mark, officers arrive in riot gear with gas masks and helmets obscuring most of their faces. They bring Ms. Stringer, wrapped in a blanket, to shower and then bind her to a restraint chair. In the last minute of the video two medical staff members walk over to Ms. Stringer. They are wearing surgical masks and scrubs. They check on her and then the video ends. No other inmates appear.

- (6) Video 253: This video is 15 minutes and 12 seconds long. It is shot with a hand-held GoPro camera. In the first three seconds, a woman who appears to be a non-party inmate can be seen exiting a shower in a towel. Starting at the 1:24 mark, another non-party inmate appears sitting in an adjacent cell to Ms. Stringer's cell, but this person's facial features are out of focus due to distance from the camera and backlighting. Most of the video portrays Ms. Stringer's cell, the common area between cells, and a shower area. At the beginning, the video depicts two officers wearing lower-face coverings and baseball caps, as well as Ms. Stringer in her cell, without any clothing. The officers repeatedly warn Ms. Stringer not to black out her window and then spray a substance into her cell causing her to cough and eventually causing the officers outside the cell to cough as well. Later in the video multiple officers appear in riot gear, with gas masks and helmets obscuring all facial features but their eyes. They restrain Ms. Stringer and bring her into the common area with

a garment covering her torso. They force her into a shower then wrap her in two towels. Around the ten-minute mark, another staff member appears holding a stethoscope and wearing a lower-face surgical mask. She appears to check Ms. Stringer's heartbeat while the officers in riot gear hold Ms. Stringer with her hands behind her back. At the end of the video, the officers leave Ms. Stringer locked in the new cell and then leave the common area into a secured hallway. There, the officers identify themselves and briefly review the encounter.

- (7) Video 240: This video is more than 30 minutes long and depicts multiple officers and inmates from a stationary, mounted vantage point. Plaintiffs do not object to the Motion as to Video 240. See Opp'n at 6 n.3.

## II. PROCEDURAL HISTORY

On April 20, 2022, Plaintiffs commenced this action. Compl., ECF 1. On July 22, 2022, the parties exchanged initial disclosures. Opp'n at 3. Defendants declined to provide the Subject Videos to Plaintiffs without an agreement to keep them confidential. Id. In response to the Complaint, Defendants filed a Motion to Dismiss on the basis of qualified immunity. ECF 44. On February 22, 2023, that motion was denied.[3] ECF 47. Defendants appealed the decision to the Third Circuit. On June 18, 2025, the Third Circuit affirmed the denial. ECF 60. This Court held a status conference on July 24, 2025, where the undersigned sought *in camera* review of the videos. ECF 70. Following this review, the Court issued an order denying qualified immunity as to the BCCF officers involved in the incident depicted in Video 253. ECF 71 ¶ 4. Defendants produced

---

[3] This case was initially assigned to the Honorable Berle M. Schiller, who issued the ruling on the Motion to Dismiss. Sadly, Judge Schiller passed away while the decision was on appeal. The case was reassigned to the undersigned.

the videos to Plaintiffs subject to a stipulation that they would seek to file a Motion for a Protective Order to keep them confidential. ECF 74. Defendants then filed the instant motion.

### III. STANDARD OF REVIEW

Rule 26 requires a litigant to demonstrate "good cause" to justify sealing documents from public view. See Fed. R. Civ. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."). To issue a protective order, the Court must balance public and private interests. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994). The movant must demonstrate good cause by showing "that disclosure will work a clearly defined and serious injury to the party seeking [to prevent] disclosure." Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984). "The injury must be shown with specificity." Id. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" are insufficient. Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).

The Third Circuit has identified seven factors to consider in evaluating whether good cause exists under Rule 26:

1. whether disclosure will violate any privacy interests;
2. whether the information is being sought for a legitimate purpose or for an improper purpose;
3. whether disclosure of the information will cause a party embarrassment;
4. whether confidentiality is being sought over information important to public health and safety;
5. whether the sharing of information among litigants will promote fairness and efficiency;
6. whether a party benefitting from the order of confidentiality is a public entity or official; and
7. whether the case involves issues important to the public.

In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 924 F.3d 662, 671 (3d Cir. 2019) (citing Glenmede Tr. Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995)). This list of factors is neither mandatory nor exhaustive. Glenmede Trust, 56 F.3d at 483.

## IV.   DISCUSSION

Defendants argue there is good cause for confidentiality because releasing the videos would compromise BCCF's security protocols and violate the privacy of those depicted. Mot. at 4–5, 6–7. Defendants assert that the videos could compromise sensitive operational information, including procedures, ingress and egress points, and potential vulnerabilities in the facility's layout. Id. at 4–5. Disclosure could allow detainees or outsiders to exploit these details. Id. In addition, Defendants contend that the release of the videos would violate Ms. Stringer's privacy, and the privacy of nonparty inmates and staff who appear in the videos. Id. at 6–7.

As a preliminary matter, the Court finds that the information being sought from the videos is for the legitimate purpose of gathering a credible account of use of force events involving Ms. Stringer. Neither party argues that the videos—which are squarely material to Plaintiffs' claims—are being sought for an improper purpose. Thus, the second Glenmede factor does not support sealing the videos. Additionally, because the movants are public entities or officials, the sixth Glenmede factor weighs against sealing. See In re Avandia, 924 F.3d at 671–72 (explaining that the sixth factor looks to "whether a party benefitting from the order of confidentiality is a public entity or official"); see also Pansy, 23 F.3d at 786 ("The public's interest is particularly legitimate and important where, as in this case, at least one of the parties to the action is a public entity or official."). In analyzing the remaining factors, the Court will address specific depictions in each video.

The Motion is uncontested as to Videos 11 and 240. The Court agrees these two videos warrant confidentiality. Video 11 does not depict a use of force event against Ms. Stringer or any interactions between an inmate and an officer. It instead depicts a 19-second conversation among officers briefly taking roll call in a secured hallway. Each officer identifies him or herself by name, heightening privacy concerns of the non-party officers in their individual capacities. Accordingly, the Court finds the individual officers' privacy interest under the first factor outweighs the minimal public interest value (under the fourth and seventh factors) of observing the interaction of public officials. Video 240 is recorded from a mounted stationary camera, which risks exposing blind spots in BCCF's stationary surveillance system and the location of the stationary camera. See, e.g., Sampel v. Livingston Cty., 17-cv-06584, 2019 WL 6695916, at *3 (W.D.N.Y. Dec. 9, 2019) (granting a protective order because stationary surveillance footage "provide[s] information … that could be used to exploit potential gaps in surveillance"). Furthermore, Video 240 does not involve a use of force incident and over its 30-minute span it depicts multiple non-party inmates. "[P]rivacy interests of innocent third parties … should weigh heavily in [the Court's] balancing equation[.]" Purcell v. Gilead Scis., Inc., 415 F. Supp. 3d 569, 578 (E.D. Pa. 2019). The security harm of exposing blind spots in BCCF's surveillance system and the privacy interests of non-party inmates, weighed against the minimal public interest in the content of the video, amount to a sufficient showing of good cause as to Video 240. Accordingly, the Court **GRANTS** the Motion as to Videos 11 and 240.

The harms Defendants identify from disclosure of the remaining videos are not sufficient to justify sealing the entirety of the videos as opposed to redacting portions of them. See Dobson v. Milton Hershey Sch., 434 F. Supp. 3d 224, 237 (M.D. Pa. 2020) (finding redaction preferable to wholesale disclosure or sealing under the good cause standard). Defendants argue releasing the

Subject Videos would endanger BCCF's security and violate the privacy of those depicted, including Ms. Stringer herself.[4]  The security interests at issue here are not as strong as security concerns in comparable cases.  Videos 4, 39, 63, 252, and 253 are all shot from hand-held GoPro cameras and therefore do not carry the same risk of exposing blind spots or camera locations as footage from a fixed surveillance system would.  Defendants cite several cases where district courts have upheld confidentiality of similar material to safeguard correctional facilities' institutional security.  Defendants' cases are distinguishable.

In Corbin, the facts at issue involved the smuggling of drugs into the correctional facility. Corbin v. Bucks County, No. 23-2738, 2024 WL 2980218, at *6 (E.D. Pa. June 13, 2024). The court determined there was a strong public interest, implicating factors four and seven, to keep the surveillance videos concealed to maintain security against future attempts to smuggle drugs. Id. at *4.  In addition, there was a strong institutional interest in avoiding public release of intake search procedure. Id.  Here, the security interest in depictions of a common area is weaker than the security interest in search procedures at an ingress and egress point.  Further, the instant case involves a strong public interest in transparency about the treatment of mentally ill inmates. Alexander v. Bucks Cnty., No. 21-CV-4633-KSM, 2023 WL 5208506, at *3 (E.D. Pa. Aug. 14, 2023) (finding the fourth and seventh factors weigh against confidentiality where "videos show … public officials using force to restrain an inmate with a mental illness, an issue that is likely of

---

[4] Defendants argue disclosure of the videos, where Ms. Stringer is at times naked, would subject her to embarrassment and therefore factor three should weigh in favor of confidentiality.  Mot. at 7.  Plaintiffs, who are Ms. Stringer's parents, oppose confidentiality and argue that BCCF does not have Ms. Stringer's best interest in mind and BCCF's resistance to disclosing the videos before the litigation began is what prevented her parents from advocating for her best interest in the first place.  Opp'n at 14.  Plaintiffs assert that Defendants are "attempt[ing] to utilize Kimberly Stringer's privacy as a basis to conceal their abuse of her" when "it was only after the abuse of Ms. Stringer was brough to public attention by other inmates that she was finally transferred to an appropriate mental health facility."  Id.  Ms. Stringer herself has not addressed the issue of embarrassment.  The Court has no evidence before it to support a finding that Defendants' view of Ms. Stringer's privacy interest is more accurate than Plaintiffs' view.  Thus, the Court will treat factor three as neutral—neither weighing for or against disclosure.

great importance to the public"). The court in Alexander ultimately found, through an *in camera* review of the videos, that security interests outweighed public disclosure interests because the videos could be used to "determine areas within the prison that are vulnerable to breaches" and to study "procedures for cell entries and cell extractions." Id. at *2–*3. Here, Defendants suggest "visitors could use [the Subject Videos] to uncover new methods to pass contraband into the facility." Kratz Decl. ¶ 27. However, the videos do not depict visitors interacting with inmates or inmates passing though ingress or egress points where they could smuggle contraband. Defendants also anticipate "knowledge of the specific procedures … would enable inmates to create diversions and countermeasures to subvert the objectives of BCCF." Kratz Decl. ¶ 25. Though there is some risk in inmates studying these procedures, the processes portrayed are not kept secret from surrounding inmates. The events depicted occur largely in the common area and in view of surrounding inmates. This Court's *in camera* review of the depiction of uniforms, tools, equipment, procedures, cells and the common area does not support a finding of such significant risk that outsiders or inmates will use the information to breach BCCF security to outweigh the public interest in transparency regarding correctional procedures for mentally ill detainees.

Defendants also rely on Palmer, which involved over 100 hours of fixed surveillance videos. Palmer v. York County, 2022 WL 4120261, at *1 (M.D. Pa. Sept. 9, 2022). The court reasoned that the "wholesale dissemination" of over 100 hours of videos was too great a security risk. Id. at *5. Here, the videos are limited to use of force instances against a single defendant and filmed with handheld cameras that do not "reveal the location and capabilities of prison surveillance cameras." Id. at *4. Finally, Defendants invoke Kearny, where the videos at issue were surveillance videos that could show blind spots, unlike the handheld cameras at issue here. Kearney v. Bayside State Prison Admin., No. 17-06269, 2023 WL 2207392, at *2 (D.N.J. Feb. 23,

2023). There, the court noted no alteration of the videos would be sufficient to prevent disclosure of highly sensitive information. Id. Further, the plaintiff withdrew his objection to the sealing request. Id. Here, the videos could be altered to redact footage filmed in a secured hallway, for example. Video 253 is the only remaining video with footage filmed in a secured hallway. To the extent that hallway exposes methods of ingress and egress as well as BCCF security protocol, the Court finds good cause to redact that portion without concealing the remaining 14 minutes of footage of the interactions in Ms. Stringer's cell and the common area.

Similarly, the privacy concerns Defendants raise are insufficient to establish good cause to seal the videos wholesale. Taken together, Videos 4, 39, 63, 252, and 253 only contain three seconds of footage of an identifiable non-party inmate. That person's privacy interest can be protected by simply redacting that portion of the footage from Video 253. Furthermore, all staff and employees, except one officer in Video 4 and one officer in Video 252 wear face coverings, due to the COVID-19 pandemic, which obscure their identities. The privacy interest of any non-party officers whose faces are exposed can be protected by blurring or redacting their faces for the duration of exposure. Finally, in Videos 4 and 253, officers are identified by name. The privacy interest of the non-party officers who are named can be protected by muting the sound when any non-party officer is identified.

In sum, Defendants have not met their burden to show good cause for a blanket ruling of confidentiality. The security risks Defendants invoke are broad and do not engage with the specific events depicted in each video. Further, the cases they rely upon involve fact patterns where there is a lesser public interest and a greater privacy and security concern. The Subject Videos here do not risk exposing private or critical areas of the BCCF because the footage occurs in a common area to which inmates have access for hours each day and cells visible from the common area.

11

Granting a protective order based on Defendant's assertions would amount to a blanket restriction that would cover nearly any footage captured in a correctional facility.

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for a Protective Order is **DENIED** in part and **GRANTED** in part. An appropriate order follows.